GLENDENNING'S LIMESTONE
& READY-MIX COMPANY, INC., Plaintiff,

v.

Michael A. REIMER, Defendant,

Henk KENKHUIS and Linda Kenkhuis,
Defendants-Third-Party Plaintiffs-Appellants,

WEST BEND MUTUAL INSURANCE COMPANY,
Intervenor-Third-Party Defendant-Respondent.

Court of Appeals

*No. 2005AP1092. Submitted on briefs November 4, 2005.
—Decided July 13, 2006.*

2006 WI App 161

(Also reported in 721 N.W.2d 704.)

On behalf of the defendants-third-party plaintiffs-appellants, the cause was submitted on the briefs of *Margery Mebane Tibbetts, Clarence F. Asmus,* and *Duffy Dillon,* of *Brennan, Steil & Bastings, S.C.,* Janesville.

On behalf of the intervenor-third-party defendant-respondent, the cause was submitted on the brief of *Rick J. Mundt* and *Laure Rakvic-Farr,* of *Winner, Wixson & Pernitz,* Madison.

Before Vergeront, Deininger and Higginbotham, JJ.

¶ 1. VERGERONT, J.   This appeal arises out of a dispute between the Kenkhuises and the general contractor hired to make improvements to the dairy facility they lease. Henk and Linda Kenkhuis appeal the circuit court's order granting summary judgment in favor of the general contractor's insurer, West Bend Mutual Insurance Company. The circuit court concluded that the commercial general liability policy (CGL) issued to the general contractor did not provide coverage for the Kenkhuises' claims against him.

¶ 2.   The primary issue on this appeal is whether the Kenkhuises' claims of breach of contract and implied warranty against the general contractor allege an "occurrence" within the meaning of the CGL policy. We conclude that faulty workmanship in itself does not constitute an "occurrence" within the meaning of this CGL policy. However, we also conclude that the factual circumstances alleged for the breach of contract and

implied warranty claims against the general contractor do contain at least one instance of an "occurrence" that causes property damage within the meaning of the policy. Therefore, West Bend is not entitled to summary judgment dismissing the Kenkhuises' cross-claims of breach of contract and implied warranty and third-party claim against West Bend based on a lack of an "occurrence." Because West Bend concedes the ground on which the circuit court granted summary judgment on these claims was in error and offers no other basis on which to affirm the circuit court, we conclude the circuit court erred in granting summary judgment in favor of West Bend on the breach of contract and implied warranty cross-claims and the third-party claim. Accordingly, we reverse and remand for further proceedings.

¶ 3.   In addition, we address two claims of procedural error and conclude that any error did not affect the Kenkhuises' substantial rights.

## BACKGROUND

¶ 4.   The Kenkhuises own a dairy herd on a farm they lease from Jeffrey Petry. The Kenkhuises and Petry hired Michael Reimer to make certain improvements to the dairy facility. Disputes arose between the Kenkhuises and Reimer about the adequacy of the work and payment, including payment of the subcontractors. When the concrete supplier, Glendenning's Limestone & Ready-Mix Company, Inc., was not paid by Reimer, it sued Reimer and the Kenkhuises. Glendenning's obtained a judgment against Reimer, and its claims against the Kenkhuises were dismissed. Meanwhile, Reimer and the Kenkhuises filed cross-claims against each other. The Kenkhuises' cross-complaint alleged that Reimer negligently performed the construction of

the improvements, breached the contract with the Kenkhuises and breached implied warranties. Proceedings on the cross-claims were stayed when Reimer filed for bankruptcy.

¶ 5. The dispute over insurance coverage that is the heart of this appeal began when West Bend, Reimer's CGL insurer, moved to intervene and to bifurcate the issues so as to decide first its obligation to defend and indemnify Reimer. The court granted the motion. West Bend moved for a summary judgment declaring that it had no duty either to defend or indemnify Reimer based on the Kenkhuises' claims against him. Along with its motion for summary judgment, West Bend filed the affidavit of its attorney averring that the policy attached was a true and correct copy of the policy issued to Reimer. West Bend asserted that the economic loss doctrine barred the negligence claim against Reimer, that a number of exclusions in the policy barred coverage for the negligence and breach of implied warranty claims, and that a breach of contract is not an "occurrence" under the policy.

¶ 6. After West Bend filed its motion, the Kenkhuises amended their cross-complaint by stipulation. They added West Bend as a defendant to their cross-claims and added a third-party claim directly against West Bend for "the property damage resulting from the mistakes and carelessness of Defendant Reimer as general contractor and/or the subcontractors hired by him and which caused accidental damage to the subject dairy facility and the Kenkhuises' property." The Kenkhuises also added these factual allegations to support their claims:

> 9. The subcontractors selected, retained and paid by Reimer to perform the construction of the improvements to the Petry dairy facility were negligent in

completing their work as follows: the concrete subcontractor poured and finished concrete for approximately 1,450 cow stalls such that the stalls have an inadequate slope; and said subcontractors failed to pour the concrete for the cow stalls over the top of a preexisting eight inch cement curb.

10. The negligence of the subcontractors hired by Reimer in performing their work caused accidental damage to the Kenkhuis' property, to wit: (a) The cow stalls are damaged in that they were not constructed per their specifications and must be repaired; (b) As a result of the inadequate slope, urine and manure gathers in puddles in the cow stalls and flows backwards rather than flowing to the designated drainage area; (c) As a result of the improper installation of rubber mats by Reimer and/or his subcontractors, the scraper which cleans manure has damaged the rubber mats; (d) The stall loops were irregularly and inconsistently installed by the subcontractors throughout the building; and (d) [sic] The neck bars for the cows are loose and irregular and not attached to either end of the barn.

11. Another consequence of the negligence of Reimer and/or the subcontractors Reimer selected, retained and paid, the Kenkhuis' dairy cows' flanks and udders are dirty creating potential for disease transmission and this has required Kenkhuis to engage extra labor at extra expense to clean the cows' utters [sic] prior to milking.

¶ 7. Although West Bend's motion sought a determination that it did not have an obligation to either defend or indemnify Reimer, the proceedings on the Kenkhuises' claims against Reimer had been stayed because of his bankruptcy filing, and Reimer did not respond to the motion. The Kenkhuises opposed the motion. They, too, argued in terms of the insurer's duty to defend the insured. However, it is apparent that they,

563

like West Bend and the circuit court, understood that the pertinent issue raised by the motion was whether they had any claim against West Bend and also understood that this issue, like the issue of West Bend's duties to Reimer, depended upon the coverage afforded by the policy.[1]

¶ 8.  In opposing West Bend's summary judgment motion, the Kenkhuises conceded that the negligence claim was barred by the economic loss doctrine but argued that there was coverage for the breach of contract and implied warranty claims. The Kenkhuises submitted their affidavits, which included averments essentially tracking the allegations in the amended pleading quoted above.

¶ 9.  The Kenkhuises also argued that West Bend's submission containing the insurance policy did not comply with WIS. STAT. § 802.08(3)[2] and should be

---

[1] The circuit court viewed West Bend's motion as directed to the Kenkhuises' amended pleading and on appeal both parties do the same. We take this same approach.

We are uncertain why the Kenkhuises both amended their cross-claims to add West Bend as a party and filed a thirty-party complaint against West Bend. On this appeal neither party appears to attach any significance to the distinction between the cross-claims against West Bend, on the one hand, and the third-party claim against West Bend on the other hand. Therefore, we use "claims against West Bend" to mean both the cross-claims and the third-party claim and we do not distinguish between them.

[2] WISCONSIN STAT. § 802.08(3) provides:

**(3)** SUPPORTING PAPERS. Supporting and opposing affidavits shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence. Copies of all papers or parts thereof referred to in an affidavit shall be attached thereto and served therewith, if not already of record. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a

denied on that basis. At the hearing on the motion, the circuit court ascertained that the Kenkhuises had not offered an affidavit disputing that the policy submitted was the correct one and did not have any knowledge that the policy was not the correct one. The circuit court stated that it would accept the submission.

¶ 10. The circuit court then granted summary judgment in West Bend's favor and dismissed all claims against it. It agreed with the Kenkhuises that, regarding the breach of contract and implied warranty claims, there was an "occurrence" under the policy under *American Family Mutual Insurance Co. v. American Girl, Inc.*, 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65. However, the court concluded that subparagraphs 5 and 6 of the "Damage to Property" exclusion applied, although this was not an exclusion that West Bend had raised.[3]

motion for summary judgment is made and supported as provided in this section, an adverse party may not rest upon the mere allegations or denials of the pleadings but the adverse party's response, by affidavits or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against such party.

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[3] The two exclusions determined applicable by the court are:

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

## Analysis

¶ 11.  On appeal, the Kenkhuises make two procedural challenges to the circuit court's decision—that it erred in sua sponte considering the "Damage to Property" exclusion and it erred in accepting West Bend's submission containing the insurance policy. The Kenkhuises also challenge the applicability of that exclusion as well as certain of the other grounds on which West Bend relied in the circuit court to argue that there was no coverage for the breach of contract and implied warranty claims.[4] We first address the two procedural challenges and then address the only ground on which West Bend now contends there is no coverage:  that there is no "occurrence" under the policy.

### I.  Circuit Court's Sua Sponte Consideration of "Damage to Property" Exclusion

¶ 12.  On appeal the Kenkhuises contend the circuit court erred in sua sponte considering the "Damage to Property" exclusion because West Bend did not raise that exclusion and, thus, did not present factual submissions showing it was applicable. In addition, the Kenkhuises assert, there is an exception to the "Damage to Property" subparagraph 6 exclusion that is applicable, and they were deprived of an opportunity to establish that this exception to the exclusion applies. West Bend responds that it "concurs with Kenkhuis'

Commercial General Liability Coverage Form Section I(2)(j)(5) and (6).

[4] We do not understand the Kenkhuises to be appealing the circuit court's dismissal of their cross-claim for negligence against West Bend. Therefore our reversal does not affect the dismissal of that claim.

analysis of this exclusion, and does not contest Kenkhuis' position that this exclusion does not bar coverage in this case." However, West Bend argues, we should affirm on the alternative ground that the Kenkhuises' cross-claims do not present an "occurrence" under the policy, notwithstanding the circuit court's ruling on this point.

¶ 13. Despite West Bend's concession that the "Damage to Property" exclusion does not apply, the Kenkhuises argue in their reply brief that we should nevertheless reverse because the circuit court did not have the authority to sua sponte consider an exclusion not raised by West Bend without giving them notice it was considering the issue and an opportunity to be heard. *See State v. Holmes*, 106 Wis. 2d 31, 40–41, 315 N.W.2d 703 (1982). Assuming without deciding that the court erred in not giving the Kenkhuises notice and an opportunity to be heard, it does not follow that the failure to do so is reversible error. We do not reverse a judgment for an error unless the error "has affected the substantial rights of the party seeking to reverse . . . ." Wis. Stat. § 805.18(2); *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶ 28, 246 Wis. 2d 1, 629 N.W.2d 768.

¶ 14. The Kenkhuises do not explain how their substantial rights have been affected by the circuit court's sua sponte consideration of the "Damage to Property" exclusion without first providing them an opportunity to be heard, given that West Bend is conceding that exclusion is inapplicable. The only ground that West Bend advances on appeal for lack of coverage is the lack of an "occurrence" under the policy, and this is an issue West Bend *did* raise in the circuit court. Indeed, even if West Bend had not raised this

567

issue in the circuit court, we may affirm the circuit court on an alternative ground as long as the record is adequate and the parties have the opportunity to brief the issue on appeal. *Doe v. Gen. Motors Acceptance Corp.*, 2001 WI App 199, ¶ 7, 247 Wis. 2d 564, 635 N.W.2d 7. We therefore conclude that the Kenkhuises have not established that they are entitled to a reversal of the summary judgment solely because the circuit court sua sponte considered the Damage to Property exclusion without giving them notice and an opportunity to be heard.

II.   Propriety of the Insurance Policy Submission

¶ 15.   The Kenkhuises contend the circuit court erred in accepting the policy attached to West Bend's counsel's affidavit because it did not comply with WIS. STAT. § 802.08(3). Without this submission, the Kenkhuises assert, there was no basis on which to grant summary judgment in favor of West Bend.

¶ 16.   We agree with the Kenkhuises that West Bend's counsel's affidavit does not show that it is based "on personal knowledge" and for that reason it does not "set forth such evidentiary facts as would [make the insurance policy] admissible in evidence." WIS. STAT. § 802.08(3). It was therefore not a proper submission.

¶ 17.   However, we agree with West Bend that the Kenkhuises have not shown that the circuit court's error in admitting this submission affected their substantial rights. West Bend points out that the Kenkhuises conceded in the circuit court that they did not have a basis for disputing that this policy is the correct one. We also observe that the Kenkhuises do not sug-

568

gest that the circuit court could not, within the proper exercise of its discretion, have given West Bend the opportunity to submit an affidavit complying with WIS. STAT. § 802.08(3), or that West Bend could not have complied if given that opportunity. The Kenkhuises do not reply to West Bend's argument that the error was harmless. We therefore conclude the Kenkhuises are not entitled to a reversal on this ground.

III.   Coverage—Is There an "Occurrence"?

¶ 18.   As noted above, West Bend's position on appeal is that we should affirm the summary judgment in its favor because the Kenkhuises' contract and implied warranty claims against Reimer do not allege an "occurrence" under the policy. According to West Bend, the amended cross-complaint alleges only negligent conduct and that is not "accidental" conduct, which is required by the policy definition. The Kenkhuises' position is that the circuit court correctly read *American Girl*, 268 Wis. 2d 16, and, under that case, a subcontractor's faulty workmanship or negligent work[5] that is the basis for a contract or warranty claim against the general contractor is an "occurrence" under the policy. When "occurrence" is given this meaning, the Kenkhuises assert, their amended cross-claims and thirty-party claim allege an "occurrence."

■■■■■

¶ 19.   We review the grant or denial of a summary judgment de novo, applying the same methodology as

---

[5] The parties appear to assume that "faulty" workmanship means work or conduct that is "negligent," and they use the terms interchangeably. For purposes of this appeal, we will make the same assumption and will use the terms interchangeably.

the circuit court. *American Girl*, 268 Wis. 2d 16, ¶ 22. Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* This appeal involves the interpretation of an insurance contract and thus presents a question of law, which we review de novo. *Id.*, ¶ 23.

¶ 20. We will first address the meaning of "occurrence" under the policy as applied in *American Girl* and other relevant cases. We will then examine the factual allegations in the amended pleading to determine whether they allege an "occurrence" under the policy.[6]

A. Meaning of "occurrence" under the policy

¶ 21. The "insuring agreement" portion of the policy provides that West Bend "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies"; and "[t]his insurance applies . . . only if: the 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . ." The policy defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 22. We begin with a discussion of *American Girl,* which is central to a resolution of the dispute over the meaning of "occurrence." In *American Girl*, the Pleasant Company entered into a contract with the

---

[6] We certified this issue to the supreme court in *Glendenning's Limestone & Ready-Mix Co. v. Reimer*, No. 05–1092, 2006 WL 300476 (Wis. Ct. App. Feb. 9, 2006). Certification was denied on March 15, 2006.

Renschler Company for the design and construction of a large warehouse. 268 Wis. 2d 16, ¶ 11. Renschler hired a soil engineer to conduct an analysis of the soil conditions at the site. *Id.*, ¶ 12. The soil engineer concluded the soil conditions were poor and recommended that a process called "rolling surcharging" be used to prepare the soil. *Id.* The surcharging was done according to the soil engineer's advice and the building was completed. *Id.*, ¶ 13. After Pleasant Company took occupancy, the building began to sink and there were damages to the building as a result of the settlement. *Id.*, ¶¶ 13–14.

¶ 23. Pleasant Company claimed that the soil engineer's negligence caused the damages to the building and Renschler thereby breached its contract with Pleasant Company. *Id.*, ¶ 17. American Family had issued a CGL policy to Renschler and contended that there was not an "occurrence" under the policy. *Id.*, ¶¶ 14, 39. American Family's CGL policy contained the same language in the insuring agreement that we have cited above in paragraph 21, with the same definition of "property damage" and "occurrence." *Id.*, ¶¶ 31–32, 33. The supreme court stated:

> No one seriously contends that the property damage to the [warehouse] was anything but accidental (it was clearly not intentional), nor does anyone argue that it was anticipated by the parties. The damage to the [warehouse] occurred as a result of the continuous, substantial, and harmful settlement of the soil underneath the building. The soil engineer's inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated, or expected. We conclude that the circumstances of this claim fall within the policy's definition of "occurrence."

*Id.*, ¶ 38 (footnote omitted).

¶ 24. American Family argued that because Pleasant Company's "claim [was] for breach of contract/breach of warranty" it could not be an "occurrence" because the CGL policy was "not intended to cover contract claims arising out of the insured's defective work or product." *Id.*, ¶ 39. The court rejected this argument explaining:

> We agree that CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an "occurrence" within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law.
>
> . . . .
>
> [T]here is nothing in the basic coverage language of the current CGL policy to support any definitive tort/contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. "Occurrence" is not defined by reference to the legal category of the claim. The term "tort" does not appear in the CGL policy.

*Id.*, ¶¶ 39, 41 (footnote omitted).

¶ 25. Thus, *American Girl* clearly establishes that the circumstances giving rise to a breach of contract or breach of warranty claim may be an "occurrence" within the meaning of a CGL policy: the analysis focuses on the factual basis for the claim and not on the theory of liability. *See 1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶¶ 58–62, 293 Wis. 2d 410, 716 N.W.2d 822.

To the extent West Bend's position is based on a disagreement with this principle, we are bound by this holding of *American Girl. See, e.g., Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997). Similarly, we do not consider West Bend's argument that prior case law—namely, *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 267, 593 N.W.2d 445 (1999), and *Vogel v. Russo*, 2000 WI 85, ¶¶ 17–18, 236 Wis. 2d 504, 613 N.W.2d 177—is inconsistent with this holding: the court in *American Girl* plainly considered and rejected these same arguments.[7] *See* 268 Wis. 2d 16, ¶¶ 40–46.

¶ 26. The more difficult question for purposes of this appeal is how to interpret *American Girl's* analysis of "occurrence." The Kenkhuises argue that, just as in *American Girl*, their property damage was accidental in that it was not intended or anticipated by the subcontractor. However, the Kenkhuises overlook the fact that the court in *American Girl* considered the "occurrence" to be the soil settlement under the completed building,

---

[7] Regarding *Vogel v. Russo*, 2000 WI 85, ¶¶ 17–18, 236 Wis. 2d 504, 512–13, 613 N.W.2d 177, the *American Girl* court stated that the no coverage determination there

> rested on the business risk exclusion, not on any inherent limitation in the initial grant of coverage. Accordingly, we caution that neither [*Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 371 N.W.2d 392 (Ct. App. 1985)], nor *Vogel* should be read for the conclusion that a loss actionable in contract rather than tort can never constitute a covered 'occurrence' under a CGL policy.

*American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 43, 268 Wis. 2d 16, 673 N.W.2d 65. Regarding *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 267, 593 N.W.2d 445 (1999), the *American Girl* court noted that there "the issue of whether the alleged breach of contract or warranty was a covered 'occurrence' under the insurer's policy was 'undisputed.' Here, unlike in *Wausau Tile*, the issue is disputed." 268 Wis. 2d 16, ¶ 46 (citation omitted).

not the faulty advice of the soil engineer. We see this most clearly in the court's summary of its holding on this issue:

> The threshold question is whether the claim at issue here is for "property damage" caused by an "occurrence" within the meaning of the CGL policies' general grant of coverage. We hold that it is. The CGL policies define "property damage" as "physical injury to tangible property." The sinking, buckling, and cracking of the warehouse was plainly "physical injury to tangible property." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." The damage to the warehouse was caused by substantial soil settlement underneath the completed building, which occurred because of the faulty site-preparation advice of the soil engineering subcontractor. It was accidental, not intentional or anticipated, and it involved the "continuous or repeated exposure" to the "same general harmful condition." Accordingly, there was "property damage" caused by an "occurrence" within the meaning of the CGL policies.

*Id.*, ¶ 5.

¶ 27. The Kenkhuises apparently focus on the following language, quoted in paragraph 23 of this opinion: "[The soil engineer's] inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated or expected." *Id.*, ¶ 38. However, when we read this language in the context of the entire paragraph 38 of *American Girl*, and in light of paragraph 5 of *American Girl*, we conclude it does not hold that the inadequate advice was the "occurrence." Rather, we think the court was saying that the inadequate advice was a cause of the "occurrence"—the soil settlement beneath the building. Thus, we do not read *American*

*Girl* to hold that the faulty advice was in itself an "occurrence" within the meaning of the policy.[8]

[8] West Bend, like the Kenkhuises, apparently reads *American Girl* as concluding that the "occurrence" was the faulty advice, and attempts to distinguish *American Girl* factually in two ways. Neither of these distinctions are persuasive. First, West Bend argues that the soil engineer's advice was "an error of omission," whereas, the concrete subcontractor's conduct in this case was "affirmative" and "volitional." West Bend views this distinction as significant because, it asserts, "omissions are regularly and properly considered 'negligence' or 'accidents' by the law," citing to the definition of "omission" in Black's Law Dictionary as "the neglect to perform what the law requires. The intentional or unintentional failure to act . . . ." However, the soil engineer in *American Girl did* give advice about how to prepare the soil and the soil was prepared according to his advice. *American Girl*, 268 Wis. 2d 16, ¶ 13. His conduct in giving the advice was no less "affirmative" or "volitional" than the subcontractor's conduct here in pouring concrete and designing and installing improvements. The soil engineer's conduct was an act of "omission" only in the sense that he "omitted" the correct advice and gave incorrect advice instead. Moreover, whether an "omission" is "negligent" is irrelevant under the analysis of *American Girl* because the court there makes very clear that the distinction between a tort and a contract claim does not determine whether there is an "occurrence" within the meaning of a CGL policy. *Id.*, ¶¶ 41–48.

West Bend's second basis for distinguishing *American Girl* is the complexity of the contracts. West Bend points out that the contract between Pleasant Company and Renschler was complicated and contained significant warranties and promises to repair and replace defective components and resulting damages, *see id.*, ¶ 11; in contrast, West Bend asserts, here there is only a one and one-half page contract, and although it provides that "[a]ll work shall be done in accordance with the attached drawings, specifications and catalog cuts," none are attached. We do not see what the complexity or completeness of the contracts between the general contractor and the property

¶ 28.  The Kenkhuises also find support for their position in *Kalchthaler v. Keller Construction Co.*, 224 Wis. 2d 387, 591 N.W.2d 169 (Ct. App. 1999), a decision of this court that the *American Girl* court cited approvingly. In *Kalchthaler*, the policy had practically the same definition of "occurrence" as does this policy. *Id.* at 394. The facts were that the subcontractors' negligent performance in constructing a residential facility resulted in windows that leaked, which caused water damage to the interior; and it was stipulated that the contractor was 50% liable for the damages based on its vicarious liability for the subcontractor's negligence and on negligent supervision of their work. *Id.* at 391, 392 n.2. We stated:

> The policy applies to property damage caused by an occurrence. Property damage, as defined by the policy, means physical injury to tangible property. Here, water entering leaky windows wrecked drapery and wallpaper. This is physical injury to tangible property. An occurrence, as defined by the policy, is an accident. An accident is an "event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result." Webster's Third New International Dictionary 11 (1993). Here, the parties have stipulated that fifty percent of the damages were due to Keller's negligence. Furthermore, there is no question that an event occurred:  the windows leaked. This is an accident. So we have property damage caused by an occurrence and the policy applies.

*Id.* at 397.

---

owner have to do with whether there is an "occurrence" under the CGL policy. *American Girl's* explanation for why the circumstances of that claim fell within the policy's definition of "occurrence" does not depend upon these characteristics of the contract between Pleasant Company and Renschler. *American Girl*, ¶ 38, quoted above at paragraph 23.

¶ 29.    Under this analysis in *Kalchthaler*, the "occurrence" was the leaking of the windows; it was not the faulty workmanship. The *American Girl* court's discussion of *Kalchthaler* appears to recognize and preserve this distinction:

> *The court of appeals has previously recognized that the faulty workmanship of a subcontractor can give rise to property damage caused by an "occurrence" within the meaning of a CGL policy.* In *Kalchthaler v. Keller Construction Co.*, 224 Wis. 2d 387, 395, 591 N.W.2d 169 (Ct. App. 1999), a general contractor subcontracted out all the work on a construction project; the completed building subsequently leaked, causing over $500,000 in water damage. The court of appeals noted that the CGL defined "occurrence" as "an accident," and further noted that "[a]n accident is an 'event or change occurring without intention or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result.' " *Id.* at 397, 591 N.W.2d 169 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (1993)). *The court of appeals concluded that the leakage was an accident and therefore an occurrence for purposes of the CGL's coverage grant. Id.*

*American Girl*, 268 Wis. 2d 16, ¶ 48 (emphasis added).

¶ 30.    The *American Girl* court does not say in the first sentence quoted above that faulty workmanship *can be the "occurrence"* that gives rise to property damage, but says instead that faulty workmanship *"can give rise to property damage caused by an 'occurrence'. . . ." Id.* (emphasis added). We understand this to mean that faulty workmanship may cause, or be a cause of, an "occurrence," such as the leaking of windows or the settling of soil under a building; we do not read it to say that faulty workmanship in itself is an "occurrence."

577

¶ 31. Our decision in *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2005 WI App 121, 284 Wis. 2d 387, 701 N.W.2d 13, *rev'd in part, aff'd in part on other grounds*, 2006 WI 94, 293 Wis. 2d 410, 716 N.W.2d 822, which we issued after the circuit court's ruling in this case, is consistent with this view. In *1325 North Van Buren*, 284 Wis. 2d 387, the plaintiff alleged the following occurred during a renovation project:

> "a concrete slab smashed into an existing ceiling that was not being modified as part of the renovation and then punched through a newly completed shear wall on the next floor of the building, rendering it useless"; "subcontractor demolishing an existing staircase on the west side of the building failed to adequately brace the second floor opening created by the removal, causing the reinforced concrete at the north side of the opening to sag and require structural bracing"; damage to already-installed work of other subcontractors; fabricated steel pieces run over by construction equipment; "demolition subcontractor . . . used a piece of equipment with a hammer attachment that did not stop at breaking out of the top layer of concrete, and instead broke completely through the reinforced concrete leaving holes completely through the slab in flooring that was otherwise not to be altered by the construction of the project" . . . .

*Id.*, ¶ 27.

¶ 32. The CGL policy in *1325 North Van Buren* had the same requirement that the property damage must be caused by an "occurrence" as does West Bend's policy, and it defined "occurrence" in the same way. *Id.*, ¶ 26. We concluded that the property damage alleged was caused by an "occurrence." *See id.*, ¶ 28. Citing *American Girl's* reference to Black's Law Dictionary's definition of "accident," we stated that *1325 North Van Buren* was seeking coverage for "accidentally caused

property damage." *Id.* Although we did not further discuss what the "occurrence" or accident was, each of the alleged items of property damage was caused by an event that was not an expected part of performing the subcontractor's work, such as smashing an existing ceiling that was not supposed to be modified. Indeed, the plaintiff in *1325 North Van Buren* emphasized in its argument that it was seeking coverage "only for . . . specific . . . accidentally-caused property damage[,]" and not "for every subcontractor failure . . . ." *Id.*, ¶ 23.

¶ 33.  In short, in neither *American Girl* as we read it, nor *Kalchthaler*, nor *1325 North Van Buren*, 284 Wis. 2d 387, was faulty workmanship in itself the "occurrence." We recognize, however, that there is some support for the Kenkhuises' position in another case, *Doyle v. Engelke*, 219 Wis. 2d 277, 580 N.W.2d 245 (1998).

¶ 34.  In *Doyle*, the supreme court concluded that the negligent supervision of employees was an "event" under that insurance policy, an "event" being defined in that policy as " 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.' " *Id.* at 289.

¶ 35.  The *Doyle* court first referred to the American Heritage Dictionary definition of "accident"—" 'an unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intent.' " *Id.* The court then referred to the definition of "negligence" as "failure to exercise the degree of care considered reasonable under the circumstances, resulting in an unintended injury to another party." *Id.* at 289–90 (citation omitted). The court reasoned:

> It is significant that both definitions center on an unintentional occurrence leading to undesirable re-

sults. As we have recognized in the past, comprehensive general liability policies are "designed to protect an insured against liability for negligent acts resulting in damage to third-parties." *General Cas. Co. of Wisconsin v. Hills*, 209 Wis. 2d 167, 183–84, 561 N.W.2d 718 (1997) (quoting Arnold P. Anderson, WISCONSIN INSURANCE LAW § 5.14, at 136 (3rd ed. 1990 & Supp. 1997)). Accordingly, we have little trouble concluding that a reasonable insured would expect the Policy provision defining "event" to include negligent acts.

*Id.* at 290.

¶ 36. *Doyle* was discussed by the court in *American Girl*, although not in the context of explaining what the "occurrence" was in *American Girl*, but in the context of rejecting the argument that an "occurrence" means only torts. *American Girl*, 268 Wis. 2d 16, ¶¶ 41, 44–45. After quoting the same *Doyle* passage we have quoted in the preceding paragraph, the *American Girl* court stated: "*Doyle* did not, however, equate the term 'accident,' as used in the CGL policy, with negligence as a form of legal liability; we simply held that negligent acts were 'accidental' within the meaning of the CGL's definition of 'event.'" *American Girl*, 268 Wis. 2d 16, ¶ 45.

¶ 37. Since, as *American Girl* establishes, we are to look at the factual circumstances of the claim to decide whether there is an "occurrence" under the policy and since, under *Doyle*, a negligent act is accidental within a policy's definition of "event" that is the same definition as "occurrence" in West Bend's policy, then it may reasonably be argued that a subcontractor's negligence, which forms the basis for a breach of contract claim against the contractor, is an "occurrence." Under this reasoning, the "occurrence" is the

faulty or negligent workmanship itself, and there is no requirement that the faulty or negligent workmanship must cause an event that constitutes the "occurrence."

¶ 38.   Ultimately, we are persuaded that we should not adopt this reasoning in this case for the following reasons. First, although *Doyle* may seem to establish a rule that all negligent acts are "accidents" for purposes of CGL policies that define "occurrence" or "event" as an "accident," the supreme court has more recently declined to apply its reasoning in *Doyle* to negligent misrepresentation, thus indicating this reasoning is not uniformly applicable to all acts that are characterized as negligent. *Everson v. Lorenz*, 2005 WI 51, ¶¶ 15–20, 280 Wis. 2d 1, 695 N.W.2d 298. Second, and more significant, although the court in *American Girl* discussed *Doyle* for other purposes, it did not rely on its reasoning in *Doyle* to conclude that the "occurrence" was the soil engineer's negligence. Instead, as we have explained above, it concluded that the "occurrence" was the soil settling beneath the building. Because the supreme court's opinion in *American Girl* is that court's most recent decision analyzing the meaning of "occurrence" under a CGL policy where the basis for the contractor's liability is the subcontractor's negligence, we conclude we should apply the analysis used in that case. We also take into account that our decisions in *Kalchthaler* and *1325 North Van Buren* are consistent with the *American Girl* analysis and do not provide support for adopting the approach of *Doyle*.

¶ 39.   We therefore conclude that faulty workmanship in itself is not an "occurrence"—that is, "an accident"—within the meaning of the CGL policy. An "accident" may be caused by faulty workmanship, but every failure to adequately perform a job, even if that

581

failure may be characterized as negligence, is not an "accident," and thus not an "occurrence" under the policy.

¶ 40. We recognize that there are other approaches that are supported by a different reading of *American Girl* and by other case law. This court, circuit courts, insurance companies, insureds, and other litigants would benefit from clarification by the supreme court on this point.

B. Analysis of factual allegations

¶ 41. We now examine the facts of this case to determine whether there was an "occurrence." The Kenkhuises and West Bend appear to agree that for this purpose we take the factual allegations in the Kenkhuises' amended pleading as true. They both on occasion refer to the Kenkhuises' affidavits, but without clarifying how the affidavits relate to the proper analysis of the factual allegations in the amended pleading. Because of this, and because we see no significant difference for purposes of this appeal between the allegations of the amended pleading and the Kenkhuises' affidavits, we confine our analysis to the factual allegations in the amended pleading. We will liberally construe those allegations in favor of coverage, as we do when we determine if an insurer has a duty to defend the insured. *See Doyle*, 219 Wis. 2d at 284.

¶ 42. We conclude the amended pleading liberally construed does allege property damage caused by an "occurrence" as the factual circumstances for the breach of contract and implied warranty claims. The pleading alleges that the rubber mats the subcontractor improperly installed were damaged by the scraper that cleans

582

the manure from them. The damage to the mats is "physical damage to tangible property." The damage was caused by an accident in that the damage was not intended or anticipated and it also was not intended or anticipated that using the scraper to clean the manure off the mats would damage the mats.

¶ 43.   Because the amended pleading alleges factual circumstances underlying the breach of contract and implied warranty claims that constitute an "occurrence" causing "property damage," West Bend is not entitled to dismissal of the claims against it based on the lack of an "occurrence." While our analysis could end here, we comment on some of the other allegations that the parties have addressed in their arguments. We agree with West Bend that, based on the allegations of the amended pleading, the stalls not being built according to specifications, the irregularly installed stall loops and the loose, irregular and unattached neck bars were not caused by an "occurrence." The only cause alleged for these is the negligent work of the subcontractors and that, as we have held above, does not, in itself, constitute an "occurrence." On the other hand, we conclude that the puddling and backward flow of the urine and manure is an "occurrence":   it is an accident in that this result was not intended or anticipated and the cause—the inadequate slope—was not intended or anticipated. However, liberally construing the amended pleading, there is no allegation that this "occurrence" caused "property damage" within the meaning of the policy. There is no allegation that the puddling and backward flow of urine and manure caused physical damage to the facility; and the damage alleged with respect to the cows is not physical damage to them, but

economic loss to the Kenkhuises because of the extra work required to keep the cows healthy.

## CONCLUSION

¶ 44. We conclude that faulty workmanship in itself does not constitute an "occurrence" within the meaning of this CGL policy. However, we also conclude that the factual circumstances alleged for the breach of contract and implied warranty claims against Reimer do contain at least one item of "property damage" caused by an "occurrence" within the meaning of the policy. Therefore, West Bend is not entitled to summary judgment dismissing the Kenkhuises' cross-claims of breach of contract and implied warranty and third-party claim against West Bend based on a lack of an "occurrence." Because West Bend concedes the circuit court erred in granting summary judgment on the ground it did and offers no other basis on which to affirm the circuit court, we conclude the circuit court erred in granting summary judgment in favor of West Bend on the breach of contract and implied warranty cross-claims and the third-party claim.

*By the Court.*—Order reversed and cause remanded.